## Conard v. Commonwealth.

(Decided April 23, 1926.)

## Appeal from Letcher Circuit Court.

1. Homicide—Evidence Held Sufficient to Support Conviction for Murder of Grocer Who Garnisheed Defendant's Wages.—Evidence held sufficient to support conviction for murder, where accused killed grocer who had garnisheed his wages, firing several shots into victim's back as he fled.

2. Criminal Law—It Cannot be Successfully Urged that Witnesses were Coached in Prosecution for Murder, where Testimony was Not in Perfect Accord as to Details.—It cannot be successfully urged that witnesses were coached in prosecution for murder, where their testimony, though not contradictory, was not in perfect accord as to number of shots fired and other details.

3. Homicide—Where Accused's Plea in Murder Case was Self-Defense, it was Not Necessary for Court to Present to Jury His Contention that Deceased was Aggressor.—Where accused's plea in murder case was self-defense, it was not necessary for court to present to jury his contention that deceased was aggressor, since it made no difference why he was in danger, if he himself was not the aggressor.

4. Criminal Law.—Affidavit for continuance held made too late in prosecution for murder, when first filed with motion and grounds for new trial.

5. Crimnial Law—Affidavit for Continuance, Filed with Motion for New Trial in Prosecution for Murder, Stating that Accused would be Able to Employ Counsel at Another Trial, Held Insufficient.—Affidavit for continuance, filed with motion for new trial in prosecution for murder, stating that accused would be able to employ counsel at another trial, held insufficient, where it was not shown that counsel appointed by court did not introduce all available testimony in his behalf.

ASTOR HOGG and D. I. DAY, for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

Robert Conard has brought us a record containing a death sentence imposed upon him for the murder of Dixie Hill. This homicide occurred under these circumstances: Both Conard and Hill were colored men, who lived in a suburb of Jenkins. Conard worked for the B. & O. S. W. Railway Company. Hill ran a grocery and sold goods to Conard on credit. They made frequent settlements. On February 8, Conard told Hill that he was unable to pay in full at that time, as he had drawn but little money on the previous pay day, but would pay him $5.00 then and more on February 23. Hill received this $5.00 and credited it upon what Conard owed him, and Conard says the balance was $31.20. Conard bought nothing more from Hill. On February 19, Hill sued Conard and attached his wages. When the order of attachment was served on Conard, he went to see Hill and tried to induce him to release it. Hill would not do so, but put him off. Conard on the following day bought a pistol. On February 21, he went to the railroad office for his money, and was told he could get no money until the attachment was released. He asked the amount of the attachment and was told that the order of attachment directed the railroad company to hold $46.20, and that as his wages only amounted to $43.75, there would be nothing coming to him. Conard insisted that he only owed Hill $31.20, and was told by the railroad authorities that he could get no money until the attachment was released. In all probability, the order of attachment had been made to include $15.00 as probable costs, in addition to the debt, but Conard did not understand that, and went to see Hill, and tried to get him to release the attachment, but Hill refused to do so. He then wanted Hill to loan him $15.00 upon his watch and chain, but Hill refused to do that. Conard told Hill that he was going to get a warrant for him for attaching for more money than he owed him, and left Hill's place of business for the purpose, as he says, of arranging to have such a warrant issued. Hill came along the road on horseback, and there is some conflict in the evidence as to whether he overtook Conard as he walked along or Conard was waiting for him. Anyway, Hill stopped his horse and he and Conard had a talk in the road. Presently Conard began shooting at Hill, and emptied his pistol. About that time, Hill

fell or got off his horse, and started to run. Conard began to reload his pistol, then Hill came back and said: "Don't do that, partner, don't shoot me, and I'll fix it up with you." He caught hold of Conard and the two started down the road together. Presently Conard jerked loose from Hill and began shooting again. Hill left the roadway and ran down into and across a creek, and out into the lowland on the opposite side, holloaing "Murder" and calling for help as he ran. Conard continued to shoot at him until he had emptied his pistol. He reloaded, crossed the creek and again took up the pursuit of Hill. Hill stopped, turned and threw up his hands. Conard shot him again and Hill fell. Hill had seven wounds on his body. No one was able to say when he received any of these wounds, except the last one. That ball entered Hill's head just above and just behind his left ear, and lodged over his left eye. After receiving that wound Hill sank down and died a few minutes later. The other wounds on his body were thus located: One shot passed through his right thigh. One grazed his left hip. This wound was powder burned. One ball entered the top of his right shoulder and came out about four or five inches lower on his back. Another entered the rear of his left shoulder and came out on his arm. Another ball entered his back below the left shoulder blade and passed out the front of his body near the left nipple. The other ball entered his lower abdomen and did not go through his body. After Hill fell, Conard came back to the road and looked for his glasses. He then returned to where Hill was lying, turned him over, straightened his feet out and said something about shooting him again, but those who had come up told him Hill was already dead. Conard insisted that Hill first accosted him, and that when he told him he was going to get a warrant for him, Hill said, "We will settle this." Then he got down from his horse and picked up a club with which he struck Conard and that he acted on the defensive throughout this whole difficulty, and that instead of his being in pursuit of Hill, Hill was in pursuit of him. The jury did not take that view of the case, and was fully justified in not doing so under the evidence.

The disinterested witnesses to this difficulty do not support Conard's contention. Only one ball is proven to have entered Hill's body from the front. If Hill had been pursuing Conard, and the latter had been fleeing from him and shooting in his self-defense, as he contends,

more of these balls would have entered Hill's body from the front. In his brief, he insists that the witnesses for the Commonwealth were not near enough to the difficulty to have heard any of the conversation that passed between Hill and Conard. The witness, Scott Tompkins, said this occurred near his house; that Conard was sitting on the side of the road as Hill came along, and holloaed to him to "hold up;" that they talked a while, but he was not able to hear the conversation. Tompkins was across the road from his house, and these parties were in the road. He does not say how far he was from them, but what he does say would indicate that he was quite near them. He also testified to what we have said above about Hill's asking Conard to not shoot him and promising to fix the matter up. He and other witnesses testified to Hill's having holloaed "Murder" and calling for help as he fled across the creek. By one witness it was shown that about two hours before the shooting, Conard said he was going to kill Hill for having "garnisheed his time."

The officer who arrested him said that on their way to jail, Conard remarked: "If I could miss the chair, I am satisfied."

After the shooting, Conard walked up the road with Marion Vanover, and Vanover testified that in response to his inquiry about what the trouble was between him and Hill, Conard said that Hill had garnisheed his time and he wanted him to release it and he would not do it, and he put him out of the way where he would not garnishee any other man's time.

Conard's counsel, in his brief, insists that he was "railroaded by coached witnesses." The record does not bear out this statement. Conard denied none of the testimony of the witnesses about what was said by Hill or about the threats he made, or his statements after the killing was done. He points out in his brief that some of the witnesses said there were as many as eighteen shots fired, while others did not think there were more than twelve shots fired. He insists that for that reason he should have a new trial; but if the witnesses had been coached, there would have been thorough agreement about the number of shots fired; there would have been thorough agreement about just when the shots were fired, and about the outcries made. The fact that these witnesses vary slightly in their testimony about the number of shots only adds to the credibility of their evidence.

One witness testified that when the last shot was fired, it looked like Conard was aiming to shoot Hill in the face, and Conard seizes upon that, and argues that that would have been impossible if the statement that he was pursuing Hill were true; but he overlooks the fact that the witness testified that Hill had stopped and given up. When Hill realized that he was wounded, that Conard was still pursuing him, it was a most natural thing for him to turn to Conard, hold up his hands, "in pleading terms," as the evidence discloses, and appeal for mercy. That brought deceased face to face with this infuriated man, who, according to the evidence, "aimed to shoot him in the face" when Hill turned his head and received this last shot back of his left ear.

We have discussed this evidence at considerable length because of Conrad's contention that this verdict is not supported by the evidence, and that the witnesses for the Commonwealth do not agree in their evidence. It is true that these witnesses do not all give the same account of this killing; but their accounts of it all harmonize with each other, and there is no statement made by any witness for the Commonwealth that conflicts with statements made by any other witness for the Commonwealth. Of course, these witnesses did not see this difficulty alike; but there is not in all the evidence for the Commonwealth, the statement of any witness which, if true, would make untrue the statement of any other witness for the Commonwealth; while the evidence of the defendant is filled with such statements. He reloaded his pistol twice, and he could not well have done that if he was being pursued. He must have known, after he first emptied his pistol, that Hill had no weapon with which to defend himself, yet he jerked loose from Hill, and emptied his pistol at him, as Hill was trying to cross the creek at a time when the other witnesses say Hill was calling for help, which Conard does not deny. Conard admits shooting at him after Hill got across the creek. Certainly, Conard was in no danger after Hill got across the creek, yet Conard crossed the creek and pursued him, and gives no satisfactory account of how he got across the creek. He does not deny the circumstances under which the Commonwealth showed he shot him the last time, and instead of the evidence failing to support this verdict, it abundantly sustains it.

We have examined the instructions carefully, and can find no fault in them. Conard's plea was self-de-

fense, which was properly presented. He says that Hill was the aggressor, and that the court should have presented that feature of the case to the jury; but that was not necessary as it made no difference why Conard was in danger. If he was not himself the aggressor, and was in danger he had the right to defend himself. He insists that he should have had more time to prepare for trial. This homicide was committed February 21, Conard was indicted May 12, and tried on May 22. He did not ask for a continuance when the case was called, but after the trial, he then filed with his motion and grounds for new trial an affidavit seeking a continuance. That was too late. See McElwain v. Com., 146 Ky. 104, 142 S. W. 234. A man has no right to take his chances on a trial and then, after the conclusion of the trial, ask for a continuance. He does not, in this affidavit, disclose any evidence which he could get or hope to get, supporting his contention. About all there is in it is the statement that if the court would give him a new trial and continue the case, he would be able to employ counsel. The court had appointed counsel for him, whose duty it was, as sworn officers of the court, to conduct his defense. Surely they appraised their oath more than money, and must have done all they could in his defense. It was their sworn duty to have made an investigation, to have obtained the names of any witnesses who knew facts favorable to defendant, and to have had them introduced when the case was tried. There is no suggestion that they did not do this, or that by a continuance of this case there is any additional evidence that the defendant could procure, and if when the case was called he had filed the same affidavit, that he filed when it was too late, there is nothing in it to have justified the court in continuing the case.

The judgment is affirmed.

Whole court sitting.